## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DUSTY D. MITCHELL,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Case No. CIV-21-829-SLP
                                      )
CLEAN HARBORS ENVIRONMENTAL           )
SERVICES, INC.,                       )
                                      )
        Defendant.                    )

## **O R D E R**

Before the Court is Defendant Clean Harbors Environmental Services, Inc.'s Motion for Summary Judgment [Doc. No. 31].  It is at issue.  *See* Pl.'s Resp. [Doc. No. 41]; Def.'s Reply [Doc. No. 44].

Plaintiff Dusty D. Mitchell worked as a sales account manager for Defendant before his termination in May 2020.  While Defendant claims it fired Plaintiff due to a downturn in business caused by the COVID-19 pandemic, Plaintiff argues Defendant actually terminated him because of his heart condition.  Plaintiff sued Defendant for disability discrimination under both the Americans with Disabilities Act, as amended, ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Oklahoma Anti-Discrimination Act ("OADA"), Okla. Stat. tit. 25, § 1101 *et seq*.

Defendant claims the undisputed material facts demonstrate, as a matter of law, that it terminated Plaintiff's employment based on a legitimate, non-discriminatory reason.  Plaintiff opposes Defendant's motion, contending that disputed issues of fact require

submission of his case to a jury.  For the following reasons, Defendant's Motion is DENIED.

## I.      **Governing Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In deciding whether summary judgment is proper, the court does not weigh the evidence, but rather determines whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); *see also Roberts v. Jackson Hole Mountain Resort Corp.*, 884 F.3d 967, 972 (10th Cir. 2018).  An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).  "Material" issues of fact include those that, under the substantive law, are essential to the proper disposition of the claim.  *Id*.  The Court must consider the factual record and reasonable inferences drawn from the record in the light most favorable to the nonmoving party. *Id.*

## II.     **Undisputed Material Facts**[1]

Defendant provides industrial services to oil and gas operators across the United States.  On October 2, 2017, Defendant hired Plaintiff into the "Midland TX Technical Sales Expert (Account Manager)" role following an interview with Doug Gebhardt, Defendant's Director of Sales, and TJ Harkness, Defendant's then-Vice President of Sales.

---

[1] The Court includes only facts that are material, supported by the summary judgment record, and not genuinely disputed.  *See* Fed. R. Civ. P. 56(c).

During his entire tenure with Defendant, Plaintiff worked within the Surface Rentals business unit overseen by Mr. Gebhardt.  In his role, Plaintiff managed drilling rig accounts for clients based primarily out of Oklahoma City and Midland, though he also worked with clients based in Colorado, New Mexico, and other parts of Texas, including Houston. Plaintiff made sales calls at offices and rig sites and attended social gatherings with his clients.  Plaintiff, who lives near Oklahoma City, spent more than half of his time traveling to Midland for work.  Most of the rest of his time was spent working out of Oklahoma City, though he did occasionally travel to clients in other locations.

During the fall of 2019, Plaintiff stretched a ligament in his arm while reaching for his backpack.  On October 17, 2019, Plaintiff visited his family doctor, Dr. Layne Keathly, due to continuing immobility in his arm.  Dr. Keathly conducted an EKG test and referred Plaintiff to a cardiologist.  On December 2, 2019, Plaintiff visited his cardiologist for a stress test.  Plaintiff forwarded the confirmation email for the cardiology appointment to Mr. Gebhardt on November 27.[2]  After his December 2, 2019 cardiology appointment, Plaintiff did not seek additional testing or medical treatment until May 2020.

Also near the end of 2019, Mr. Gebhardt decided that the Surface Rentals business unit needed a stronger presence in the Houston area.  Mr. Harkness took the lead on identifying a qualified candidate for the role.  In March 2020, however, the COVID-19 pandemic dramatically disrupted Defendant's business.  Defendant's clients suspended rig

---

[2] Though Plaintiff and Mr. Gebhardt discussed his heart issue around this time, the record is not clear to what extent they discussed it.  *See* Gebhardt Dep. [Doc. No. 41-1] at 24:21–32:23; 43:23–44:2.

visits, office visits, and social gatherings, and formerly in-person field work shifted remote. The number of rigs Defendant serviced declined steeply between 2017 and March 2020— from 127 to 17 in Oklahoma, and from 448 to 201 in Texas. Plaintiff's individual workload also dramatically decreased during this time, and he ultimately lost his largest client.

In early March, Mr. Harkness and Mr. Gebhardt discussed making changes to the sales team in accordance with a reduction in force (RIF). Mr. Gebhardt had discretion as to "how [he] was going to restructure [his] team," including how many people to terminate, though he understood that "approximately at least one to two" members of his team would be subject to the RIF. Gebhardt Dep. [Doc. No. 41-1] at 11:22–23. Mr. Gebhardt also had latitude regarding when the termination of his team members would occur. Accordingly, Mr. Gebhardt was the sole decisionmaker in Plaintiff's termination. Defendant's Human Resources Director, Rod Caroca, provided Mr. Gebhardt with a forced-ranking form to determine which employees in his group should be terminated. While Mr. Gebhardt had seen the forced-ranking criteria in previous trainings and classes, he had not previously ranked his employees on any of those criteria. Mr. Gebhardt had not seen or used a forced-ranking form before,[3] but the form itself contained instructions—including a description of the relevant criteria and a reminder that employees should be "treated in a fair and non-discriminatory manner." [Doc. Nos. 31-5, 31-6]. This guidance is in accordance with

---

[3] There is conflicting evidence in the record concerning the level of training Mr. Gebhardt received prior to filling out the forced-ranking form. While Mr. Gebhardt's affidavit states that "[HR Director] Caroca instructed [him] on how to conduct the forced ranking," Gebhardt Aff. [Doc. No. 31-1] ¶ 9, he testified in his deposition that he did not receive training concerning the forced ranking, *see* Gebhardt Dep. [Doc. No. 41-1] at 16:1–2.

Defendant's Sexual Harassment and Discrimination Prevention Policy, which "encourages reporting of all perceived incidents of discrimination." *See* [Doc. No. 31-6] at 3.

The form required Mr. Gebhardt to rank each of his team members in eight categories: adaptability, alignment and compliance, customer focus, informative communication, peer relationships, problem solving, productive work habits, and functional/technical skills. Mr. Gebhardt filled out the first form on March 26, 2020. Based on Mr. Gebhardt's ranking, Plaintiff and another employee, John Pryor, III, tied for second-to-last place. Mr. Pryor, who does not have a disability, is based in Midland. Neither Plaintiff nor Mr. Pryor was terminated at this time, but the employee who ranked last was let go as part of the RIF.

In early May, Plaintiff began experiencing worsening symptoms. In a May 5 email, Mr. Gebhardt relayed that Plaintiff informed him "something is wrong with [his] body" and that his "heart starts racing very fast, almost like [he] see[s] stars or [] get[s] lightheaded." [Doc. No. 41-4]. On May 6, after Mr. Gebhardt emailed him about a missing daily report, Plaintiff wrote back: "I have a health issue I'm working on. I wish you could understand this." [Doc. No. 41-5]. That same day, Defendant contacted Michael Kelley about filling the Houston-based sales position that Mr. Gebhardt had identified near the end of 2019.[4] On Thursday, May 7, Plaintiff submitted a request for time off on May 7 and May 8.

---

[4] The record is not clear about *who* specifically reached out to Mr. Kelley.

The following Monday, May 11, Plaintiff emailed Mr. Gebhardt regarding an appointment he had scheduled with his cardiologist for May 12. In the meantime, the email stated, Dr. Keathly recommended that Plaintiff take off the entire week (May 11 through May 15). Plaintiff attached a note from Dr. Keathly, which stated that Plaintiff would "need further cardiac work up including coronary angiography." [Doc. No. 41-9]. The same day, Mr. Gebhardt copied HR Director Caroca on an email about Plaintiff's medical issues, relaying:

> Last Thursday [Plaintiff] called to let me know again that something was really wrong with him. . . . He took a half day Thursday and Full Day off Friday. . . . [Plaintiff] went to the Doctor and sounds like he will be scheduled for a procedure in the near future. In the meantime, his Doctor has recommended he take a week off, email attached. Rod – please give me a call this afternoon if you have a free minute.

[Doc. No. 41-11] (capitalization in original). Mr. Gebhardt wanted to speak with HR Director Caroca about Plaintiff's termination.[5]

The next day, May 12, Mr. Gebhardt again asked HR Director Caroca to contact him. That same day, Mr. Kelley received an offer letter from Defendant. Mr. Kelley had to undergo a preemployment physical, which did not identify any cardiovascular conditions. On May 13, Mr. Gebhardt again emailed HR Director Caroca asking to "connect today or first thing in the morning," noting the matter was "kind of urgent." [Doc. No. 41-12]. Later that afternoon, HR Director Caroca emailed Mr. Gebhardt back, stating:

---

[5] Defendant argues that Mr. Gebhardt wanted to speak with HR Director Caroca because they had already decided to terminate Plaintiff, and Mr. Gebhardt wanted to ensure Plaintiff's medical issues would not interfere with that plan. Plaintiff disputes this characterization because there is no evidence in the record indicating that the two men had previously discussed Plaintiff's termination. Regardless, the record is clear that Mr. Gebhardt had decided to terminate Plaintiff by May 11 at the latest.

"Thanks for the chat Doug.  As discussed once you and TJ have had a chance to discuss details shoot me over a forced ranking with an action date."  *Id.*

On May 14, Michael Kelley signed his offer letter accepting the Houston-based sales position with Defendant, in which he supported clients in the United States and Canada.  That same day, Mr. Gebhardt emailed HR Director Caroca a forced-ranking form, with Plaintiff ranked last.  Mr. Gebhardt later explained why he ranked Plaintiff lower than Mr. Pryor, though the two had tied for second-to-last place on the earlier form.[6]  Mr. Gebhardt recalled that between March and May, Mr. Pryor "had evolved into the Surface Rentals business unit's subject matter expert, and he was outperforming [Plaintiff] in developing new leads given the challenging environment brought about by the pandemic, as well as meeting Salesforce and reporting expectations over [Plaintiff]."  Gebhardt Aff. [Doc. No. 31-1] ¶ 11.  He recalled that his decision was also motivated by the fact that Mr. Pryor lived in Midland, "the main city in the Permian Basin," which allowed Defendant to save on fuel and maintenance costs and avoid lost productivity time.  *Id.* ¶ 12,

On May 14, Mr. Gebhardt, Mr. Harkness, and HR Director Caroca exchanged a series of emails discussing when to terminate Plaintiff.  Mr. Gebhardt initially suggested either Friday, May 22 or Monday, May 25.  In response, Mr. Harkness proposed May 20 or May 21, reasoning that Friday terminations are more difficult for employees.  On Monday May 18, four days after that email exchange, Mr. Kelley began working for

---

[6] Plaintiff disputes this fact, arguing that Mr. Gebhardt's proffered reasons are post-hoc and self-serving.  But "a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences." *Ramirez v. IBP, Inc.*, 913 F. Supp. 1421, 1425 (D. Kan. 1995).

Defendant.  That same day, Mr. Gebhardt emailed Mr. Harkness and HR Director Caroca to confirm that Plaintiff would still be terminated on Wednesday or Thursday of that week.

The following day, May 19, Plaintiff sent Mr. Gebhardt an email with the subject line "Re: City Sales/ Medical Update," which read:

> I haven't had a phone call from any management checking on my health condition.  I had a top ten list put together this morning while waiting for you to get on the call.  My cardio angiography will by Thursday [May 21].  I need to take this week off.  I'll use vacation if I need to.  I'm not taking a risk of stressing my self [sic] before I know if I'm clear.  Please let me deal with my customers instead of you taking everything from me.  (Jagged Peak and SM) I tried to call you earlier to give you an update.

[Doc. No. 41-19] at 2.  Mr. Gebhardt forwarded Plaintiff's email to Mr. Harkness, copying HR Director Caroca, and asked if Mr. Harkness "ha[d] a minute to chat."  *Id.* at 1.  In his email to Mr. Harkness, Mr. Gebhardt stated that Plaintiff "seems to be acting a bit unpredictable," and that Mr. Gebhardt "would prefer that we do it as soon as we can."  *Id.* HR Director Caroca and Mr. Gebhardt exchanged a series of emails until about 10:00 p.m. that evening, finalizing the details of Plaintiff's termination.  Mr. Harkness was copied on the email exchange.

The next day, May 20, Defendant terminated Plaintiff.   Following Plaintiff's termination, Mr. Kelley took ownership of several client accounts that previously belonged to Plaintiff.  The "Post Employment FAQ for Employees – US" provided to Plaintiff read, in part: "From midnight on your last day of employment until your COBRA election form and your premium payment is received by Wage Works, your benefit coverage is not in effect." [Doc. No. 41-23] at 6.  Mr. Gebhardt denied knowing that Plaintiff's health

insurance would terminate at midnight on May 20, the day before his scheduled procedure. Plaintiff was ultimately diagnosed with cardiomyopathy.

## III.   Analysis

### A.   Disability Discrimination Claim

Following his termination, Plaintiff sued Defendant for disability discrimination under both the ADA and the OADA.  The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the . . . discharge of employees."   42 U.S.C. § 12112(a).   Similarly, the OADA prohibits employment discrimination on the basis disability.  *See* Okla. Stat. tit. 25, § 1302.  "[T]he protections provided by the OADA are 'co-extensive with the protections provided by federal law under the ADA,'" so the Court applies the same analysis to both claims.  *Hamilton v. Okla. City Univ.*, 911 F. Supp. 2d 1199, 1206 (W.D. Okla. 2012) (*quoting McCully v. Am. Airlines, Inc.*, 695 F. Supp. 2d 1225, 1246–47 (N.D. Okla. 2010), *aff'd,* 406 F. App'x 260 (10th Cir. 2010)), *aff'd*, 563 F. App'x. 597 (10th Cir. 2014) (unpublished).

Absent direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies.  *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  "In the summary judgment context, a plaintiff initially must raise a genuine issue of material fact on each element of the prima facie case." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).  If he does so, the burden then shifts to Defendant "to articulate some legitimate, nondiscriminatory reason" for terminating Plaintiff.  *Kendrick*, 220 F.3d at 1226 (quoting

*McDonnell Douglas*, 411 U.S. at 802).  Finally, the burden shifts back to Plaintiff to "show that the defendant's justification is pretextual."  *Id.*

### 1.     Plaintiff's Prima Facie Case of Disability Discrimination

Plaintiff alleges that Defendant terminated him because of his disability.   To establish his prima facie discrimination case, Plaintiff "must show: (1) he is disabled within the meaning of the ADA; (2) he can perform, either with or without reasonable accommodation, the essential functions of the desired job; and (3) 'that [Defendant] terminated him because of his disability.'"  *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.4 (10th Cir. 2004) (quoting *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir.1995)).  Because Defendant's Motion does not challenge the second element, the Court addresses only the first and third elements of Plaintiff's prima facie case.

### a.  Qualifying Disability

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[7]  42 U.S.C. § 12102(1).  "To demonstrate disability for purposes of an ADA claim under subsection (A), [Plaintiff] must show: (1) he has an impairment that (2) substantially limits (3) a major life activity."  *Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 545 (10th Cir. 2014).  The first and third elements present questions of law, but "ascertaining whether the impairment

---

[7] Defendant argues Plaintiff has failed to make a showing under both subsections (A) and (C). Because Plaintiff has proffered sufficient evidence under subsection (A), the Court does not consider argument under subsection (C).

substantially limits the major life activity is a factual question for the jury." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003); *see also Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011).

A physical impairment includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems," including the cardiovascular and circulatory systems. 29 C.F.R. § 1630.2(h). Defendant asserts that Plaintiff's impairment is insufficient under this definition because he "only alleges that he needed an angiogram for his arrhythmia, which is an irregular heartbeat." Mot. [Doc. No. 31] at 12. But the record before the Court shows Plaintiff was "diagnosed with cardiomyopathy," which is a "disease of the heart muscle" affecting the "cardiovascular system." Keathly Aff. [Doc. No. 41-27] ¶¶ 3–4

Following the ADA Amendments Act of 2008, the definition of "major life activity" was broadened, making it easier to satisfy the requirement. *See Smothers*, 740 F.3d at 545 n.16. The term now includes "[t]he operation of a major bodily function, including . . . circulatory[] [and] cardiovascular . . . functions." 29 C.F.R. § 1630.2(i). "The operation of a major bodily function includes the operation of an individual organ within a body system." *Id.* Dr. Keathly's affidavit states that Plaintiff's cardiomyopathy "significantly impair[s] *the operation of the cardiovascular system* in comparison to a normal, healthy cardiovascular system." Keathly Aff. [Doc. No. 41-27] ¶ 4 (emphasis added).

Finally, Plaintiff must demonstrate that his cardiomyopathy *substantially limits* a major life activity. "Because this is a factual determination, the relevant question . . . is whether [Plaintiff] has presented enough evidence to create a genuine dispute as to any

material fact that necessitates resolution by a jury." *Carter*, 662 F.3d at 1143 (citations omitted).  While "not every impairment will constitute a disability," the regulations instruct that "'[s]ubstantially limits' is not meant to be a demanding standard" and the inquiry "should not demand extensive analysis." 29 C.F.R. § 1630.2(j).  Plaintiff does not need to establish that his impairment "prevent[s], or significantly or severely restrict[s]" a "major life activity," but must only show that it substantially limits his ability "to perform a major life activity *as compared to most people in the general population*." *Id.* (emphasis added). Again, Dr. Keathly's affidavit specifically states that Plaintiff's condition weakens the "operation of [his] cardiovascular system *in comparison to a normal, healthy cardiovascular system*." Keathly Aff. [Doc. No. 41-27] ¶ 4 (emphasis added).  The evidence in the record, therefore, would permit a factfinder to conclude that Plaintiff's cardiomyopathy substantially limits his cardiovascular system.

Defendant proffers two arguments, both of which the Court finds unpersuasive. First, Defendant claims expert testimony is necessary to establish that Plaintiff has a physical impairment, and that his impairment is linked to the limitation of a major life activity.  The Court need not reach the merits of this argument.  Because Plaintiff's response includes a sworn affidavit signed by Dr. Keathly, Defendant's argument on this point is moot.[8]  Defendant also argues Plaintiff is not disabled because he was formally diagnosed with cardiomyopathy *after* Mr. Gebhardt decided to terminate him.[9]  Defendant

---

[8] Plaintiff has designated Dr. Keathly as a non-retained expert in this case.  *See* Pl.'s Non-Retained Expert List [Doc. No. 14].

[9] The timing of Plaintiff's diagnosis is unclear.  Defendant, citing Plaintiff's medical records,

does not cite any case law to support this proposition.  Instead, as Plaintiff maintains, establishing a disability under the ADA does not *necessarily* require a formal diagnosis. *See Aldrich v. Boeing Co.*, 146 F.3d 1265, 1270 (10th Cir. 1998) ("Such determinations are not susceptible to per se rules; they must be made on a case-by-case basis.").

Considering the particular facts of this case, the lack of a formal diagnosis at the time of Plaintiff's termination is not fatal to his claim.  Based on the evidence in the record, a jury could reasonably conclude that Plaintiff was disabled at the time of his termination. Plaintiff first saw his primary care physician for a strained muscle in his chest in the fall of 2019.  On November 27, 2019, Plaintiff forwarded Mr. Gebhardt the confirmation email for his December 2 cardiology appointment.  On May 5, Plaintiff described his symptoms to Mr. Gebhardt and explained that something was wrong with him.  Mr. Gebhardt recalled that Plaintiff told him "again" on May 7 "that something was really wrong with him," and that he would be likely "be scheduled for a procedure in the near future."  [Doc. No. 41-11].  Accordingly, Plaintiff has raised a genuine issue of material fact on the first element of his prima facie case.

### b. Causation

"To survive summary judgment, [Plaintiff] must produce enough evidence for a reasonable jury to conclude that he was fired because of his disability."  *Carter v.*

---

asserts that he was diagnosed with cardiomyopathy on May 15, 2020—before his termination, but after Mr. Gebhardt decided to terminate him.  *See* Def.'s Reply [Doc. No. 44] at 5.  Plaintiff, on the other hand, states he was not diagnosed until after his termination.  *See* Pl.'s Resp. [Doc. No. 41] at 15.  Regardless, the parties agree his formal diagnosis came at some point after Mr. Gebhardt decided to terminate him.

*Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1147 (10th Cir. 2011).  "While the burden is not onerous, it is also not empty or perfunctory." *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1251 (D. Colo. 2012), (quoting *Butler v. City of Prairie Vill.*, 172 F.3d 736, 747–49 (10th Cir.1999)), *aff'd*, 550 F. App'x. 596 (10th Cir. 2013) (unpublished).  "[P]laintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, [he] would be entitled to judgment as a matter of law." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir. 1997).

Plaintiff argues that the short temporal proximity between his worsening medical issues and his termination satisfies the causation requirement.  The Court agrees.  Temporal proximity may be sufficient to establish causation, but this is not always the case.  *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) ("[W]e have held that a one and one-half month period between protected activity and adverse action may, by itself, establish causation. By contrast, we have held that a three-month period, standing alone, is insufficient to establish causation." (citations omitted)).  Thus, the two events must be "*very closely* connected in time," or else "[P]laintiff must rely on additional evidence beyond temporal proximity to establish causation."  *Winston v. Ross*, 725 F. App'x. 659, 665 (10th Cir. 2018) (quoting *Anderson*, 181 F.3d at 1179).

Here, the timing between Plaintiff's additional medical disclosures and Defendant's decision to terminate him is sufficient to establish the last element of Plaintiff's prima facie

case.[10]  While Plaintiff's symptoms began in the fall of 2019, they worsened in early May 2020, culminating in the following series of events:

- **May 5**: Plaintiff tells Mr. Gebhardt "something is wrong with [his] body." [Doc. No. 41-4].  He discloses his symptoms, indicating that his heart races, he sees stars, and he becomes lightheaded.

- **May 6**: Plaintiff tells Mr. Gebhardt he is working on a health issue.

- **May 7**: Plaintiff requests two days off work and communicates that "something [is] really wrong with him."  [Doc. No. 41-11].

- **May 11**: Plaintiff informs Mr. Gebhardt that he will need further cardiac testing, including an angiogram, and that he will need to take the entire week off.  Mr. Gebhardt forwards this information to HR Director Caroca and asks to connect, intending to discuss terminating Plaintiff.[11]

Six days passed between the time that Plaintiff alerted Mr. Gebhardt to his worsening symptoms and the time that Mr. Gebhardt emailed HR Director Caroca about terminating

---

[10] As stated below, the Court finds there is evidence in the record to establish a genuine issue of material fact on the issue of pretext.  Even if temporal proximity alone was not sufficient, that pretext evidence is also relevant to the causation element of Plaintiff's prima facie case.  *See Strunk v. Airxcel, Inc.*, 21-1164-JWB, 2022 WL 4447420, at *4 (D. Kan. Sept. 23, 2022) ("[I]in the context of a RIF the prima facie analysis tends to merge with analysis of pretext, because the employer almost always cites the RIF as the non-discriminatory reason for the plaintiff's termination.").

[11] Mr. Gebhardt later recalled "trying to connect with [HR Director Caroca] at this point" because he "believe[d] that [they] had already at the time" decided to terminate Plaintiff and, "[i]n light of [Plaintiff's] circumstances, [he] wanted to make sure that [HR Director Caroca] was completely looped in" and that "all of [their] bases were covered."  Gebhardt Dep. [Doc. No. 41-1] at 52:3–52:10.

But aside from the second forced-ranking form, which is dated May 14, there is no evidence in the

Plaintiff. This temporal proximity is short enough to satisfy the causation element of Plaintiff's prima facie case. Accordingly, Plaintiff has produced sufficient evidence to establish his prima facie case under the *McDonnell Douglas* framework.

### 2. Defendant's Nondiscriminatory Reason

The burden then shifts to Defendant "'to articulate some legitimate, nondiscriminatory reason' for its employment action." *Kendrick*, 220 F.3d at 1226 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802). "[D]efendant's 'burden is one of production, not persuasion; it can involve no credibility assessment.'" *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). Defendant asserts that it conducted a RIF after the COVID-19 pandemic caused a sharp decline in its business, and Plaintiff was subject to the RIF because he ranked lowest on the May 14, 2020 forced-ranking form. Thus, the Court finds Defendant has satisfied its burden by providing a facially nondiscriminatory reason for terminating Plaintiff.

### 3. Pretext

"To survive a motion for summary judgment at the pretext step, the plaintiff must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual." *Id.*; *see also Jones v. Okla. City Pub. Sch.*, 617 F.3d 1273, 1280 (10th Cir. 2010) ("[O]nce a

---

record suggesting *when* Mr. Gebhardt and HR Director Caroca discussed terminating Plaintiff. Thus, the Court finds Plaintiff's proffered evidence is sufficient to establish a genuine dispute of material fact.

plaintiff presents evidence sufficient to create a genuine factual dispute regarding the veracity of a defendant's nondiscriminatory reason, we presume the jury could infer that the employer acted for a discriminatory reason and must deny summary judgment." (quotation omitted) (analyzing ADEA claim)).   Plaintiff can satisfy this burden "by demonstrating the proffered reason is factually false, or that discrimination was a primary factor in the employer's decision." *DePaula*, 859 F.3d at 970 (internal quotation marks and citation omitted).   Pretext may be demonstrated by "revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (internal quotation marks and citation omitted).   But "mere conjecture . . . is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

In the context of the RIF, Plaintiff may demonstrate pretext by "present[ing] evidence that (1) his own termination does not accord with the RIF criteria, (2) Defendant's RIF criteria were deliberately falsified or manipulated in order to terminate him, or (3) that the RIF generally was pretextual."[12]  *Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006).  Plaintiff can succeed under the third approach by "showing that the defendant actively sought to replace a number of RIF-terminated employees with new hires during the RIF general time frame." *Id.*  In assessing pretext, however, the court

---

[12] While pretext evidence often falls into one of these three categories, "[t]his list is nonexclusive." *Agassounon v. Jeppesen Sanderson, Inc.*, 688 F. App'x. 507, 510 (10th Cir. 2017) (unpublished) (citing *Conroy v. Vilsack*, 707 F.3d 1163, 1172 (10th Cir. 2013)).

may not "second guess" the employer's business judgment.  *DePaula*, 859 F.3d at 970–71.

The Court must examine the facts as they appeared to the decisionmaker, not from

Plaintiff's subjective perspective.  *Id.* at 971.  Thus, "[i]nstead of asking whether the

employer's reasons were wise, fair or correct, the relevant inquiry is whether the employer

honestly believed those reasons and acted in good faith upon those beliefs."  *Id.* (internal

quotation marks and citation omitted).

The Court finds there is evidence in the record to establish a genuine issue of

material fact as to whether Defendant's reason for terminating Plaintiff was pretextual.[13]

Plaintiff again relies on the close temporal proximity between his worsening medical

condition and his termination, detailed above.  Temporal proximity, while typically

considered in the causation element of an employee's prima facie case, may also be

relevant in the pretext analysis.  *See Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205,

1218 (10th Cir. 2003) ("[E]vidence supporting the prima facie case is often helpful in the

pretext stage and nothing about the *McDonnell Douglas* formula requires us to ration the

evidence between one stage or the other." (quoting *Farrell v. Planters Lifesavers Co.*, 206

F.3d 271, 286 (3d Cir. 2000))).  Though temporal proximity may not be sufficient to satisfy

a party's pretext burden, Plaintiff proffers other evidence to support his pretext argument.

For example, Plaintiff argues Mr. Gebhardt reverse-engineered the May forced-

ranking sheet to justify terminating him based on his disability.  Plaintiff highlights the fact

that HR Director Caroca requested a forced-ranking sheet *after* he and Mr. Gebhardt had

---

[13] Because the Court finds there is sufficient evidence of pretext, it does not address every argument Plaintiff makes.

already discussed terminating Plaintiff.  This timing could suggest that the "RIF criteria were deliberately falsified or manipulated in order to terminate" Plaintiff.  *Pippin*, 440 F.3d at 1193.  Defendant argues that Plaintiff had ranked second-to-last on the March forced-ranking form, and Mr. Gebhardt gave several reasons why he ranked Plaintiff lower than Mr. Pryor on the May form.  But, as Plaintiff points out, there are no contemporaneous documents supporting Mr. Gebhardt's later assertions.  A reasonable jury could decide to disbelieve Mr. Gebhardt's proffered reasons because the form he used to justify Plaintiff's termination was completed after he had already made his decision.

The Court also agrees with Plaintiff's assertion that Defendant's decision to hire Mr. Kelley is relevant to the pretext analysis.   The decision could create an "inconsistenc[y], incoherence[], or contradiction[] in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *DePaula*, 859 F.3d at 970 (internal quotation marks and citation omitted); *see also Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1175 (10th Cir. 1998), 145 F.3d 1159, 1175 (10th Cir. 1998) (concluding that Defendant's choice to "hir[e] into positions similar to [Plaintiff's] at the very time it claimed the elimination of positions such as [Plaintiff's] was operationally required" was "certainly sufficient to support a finding of pretext"). Defendant argues a sudden downturn in business and revenue ground its workflow to a near halt, requiring some members of Mr. Gebhardt's sales team to be terminated as part of the RIF.  Defendant's decision to hire an additional salesperson just days before finalizing Plaintiff's termination, however, could rationally undercut the proffered justification.  Though Defendant urges that Mr. Kelley was not hired to *replace* Plaintiff,

evidence in the record could permit a jury to reach the opposite conclusion.  Defendant offered Mr. Kelley the job on the same day Mr. Gebhardt contacted HR Director Caroca about terminating Plaintiff.  Mr. Kelley and Plaintiff both served in sales roles under Mr. Gebhardt, and Mr. Kelley ultimately took over at least six of Plaintiff's former accounts.[14] C*f. Furr v. Seagate Tech., Inc.*, 82 F.3d 980, 986 (10th Cir. 1996) (finding no pretext when new employees "were not hired into Plaintiffs' positions or positions comparable to theirs").

Finally, Plaintiff argues the May 2020 iteration of the RIF—which occurred after Plaintiff disclosed his worsening health condition—was not genuine.  According to Plaintiff, there is no evidence that Defendant intended to terminate additional employees after the March RIF, nor is there evidence about the overall scale and scope of the RIF.  Indeed, Mr. Gebhardt testified he is unaware of any documents setting forth the number of people subject to the RIF or the timeframe in which they would be terminated.  Instead, he stated that he was given latitude to restructure his own team, but that he and Mr. Harkness "were looking at [terminating] approximately at least one to two" of his employees.

---

[14] Defendant's EEOC Position Statement alleged that Mr. Kelley "is not responsible for [Plaintiff's] job duties nor was he ever given [Plaintiff's] responsibilities."  [Doc. No. 41-3] at 3.  But Plaintiff proffered evidence that Mr. Kelley assumed responsibility for six of Plaintiff's former accounts, rebutting Defendant's assertion and creating a genuine dispute of material fact as to Mr. Kelley's precise job duties.  *See* Gebhardt Dep. [Doc. No. 41-1] at 126:24–127:16.

There is also conflicting evidence in the record regarding Mr. Kelley's exact role.  Mr. Gebhardt stated Mr. Kelley filled the "City Sales position," Gebhardt Aff. [Doc. No. 31-1] ¶ 14, but Defendant listed Mr. Kelley's job title as "Sales Representative," *see* Def.'s Ans. to Int. No. 5 [Doc. No. 41-26] at 2.  Nevertheless, the record is clear that Mr. Kelley's role involved sales, including to clients previously handled by Plaintiff.  *Cf. Doan v. Seagate Tech., Inc.*, 82 F.3d 974, 977 (10th Cir. 1996) ("The fact that a company is hiring accounting clerks shortly after reducing its engineering workforce does not indicate that the engineering RIF is pretextual.").

Gebhardt Dep. [Doc. No. 41-1] at 10:21–11:23.  When considered in conjunction with the other evidence of pretext, the Court agrees the lack of records regarding the structure of the RIF strengthens Plaintiff's pretext argument.  *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 533–34 (6th Cir. 2007) (finding the lack of an objective RIF plan, coupled with other evidence of pretext in ADEA case, "would permit a reasonable fact-finder to conclude that [Defendant's] proffered nondiscriminatory reason for terminating [Plaintiff] was a pretext for discrimination"), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *Kirsch v. St. Paul Motorsports, Inc.*, No. CIV. 11-2624, 2013 WL 1900620, at *4 (D. Minn. May 7, 2013) ("Where there is . . . no evidence of an objective plan for implementing a RIF, the legitimacy of the RIF may be called into question.").[15]

Defendant's arguments to the contrary are unavailing.  In its Reply, Defendant argues Mr. Gebhardt ranked Plaintiff last partly because of certain Salesforce data that showed Plaintiff had the lowest standing among his peers.  *See* Def.'s Reply [Doc. No. 44] at 9.  This data, however, covers the 30-day period ending on May 18, 2020, *see generally* [Doc. No. 44-1]—at least one week *after* Mr. Gebhardt decided to terminate Plaintiff, and

---

[15] In considering this argument, the Court is mindful that it "must not sit as a super-personnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight." *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813–14 (10th Cir. 2000). The Court does not suggest, for instance, that only one member of Mr. Gebhardt's team should have been subject to the RIF, or that another employee should have ranked lower than Plaintiff. Indeed, Plaintiff's subjective beliefs about his own performance are irrelevant to the pretext analysis. *See Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

Rather, the Court finds Defendant's lack of information regarding the structure of the RIF is pertinent to the pretext analysis—particularly in conjunction with the timing of Plaintiff's ranking relative to his health issues—because it could permit a reasonable factfinder to conclude that no other employees were subject to the RIF in May 2020.

during a period in which Plaintiff took several days off for medical leave. Reliance on sales data from a period when Plaintiff was not regularly working calls into question "whether [Defendant] honestly believed" its reasoning for firing Plaintiff and whether it "acted in good faith upon those beliefs." *DePaula*, 859 F.3d at 971.

Defendant also notes that Mr. Gebhardt's wife previously had an angiogram in connection with a heart attack. Consequently, Defendant argues, "[i]t simply defies logic that Gebhardt would seek to artificially rank Plaintiff lower in March 2020 because Plaintiff needed the same test that Gebhardt's wife previously needed." Def.'s Reply [Doc. No. 44] at 3. But a reasonable factfinder could draw the opposite conclusion, concluding that Mr. Gebhardt has greater concern towards his wife's heart condition than towards his employee's.

The Court finds that the evidence in the record, taken as a whole, could permit a reasonable factfinder to disbelieve Defendant's proffered reason for Plaintiff's termination.[16] Consequently, Defendant is not entitled to summary judgment on Plaintiff's ADA claim.

### B.    State Law Claims

Plaintiff also brings a state-law disability discrimination claim under the OADA. The Court has determined Defendant is not entitled to summary judgment on Plaintiff's federal claim of discrimination. Necessarily, therefore, the Court reaches the same

---

[16] Plaintiff contends that each individual justification is sufficient to establish pretext. Because the Court considers the totality of the circumstances, it need not—and does not—consider whether any justification *standing alone* would satisfy Plaintiff's burden. *See Beaird*, 145 F.3d at 1174.

conclusion with regard to Plaintiff's state-law discrimination claim.  *See George v. Cmty. Health Centers Inc.*, No. CV 21-00464-PRW, 2022 WL 697787, at *7 (W.D. Okla. Mar. 8, 2022); *Payne v. WS Servs., LLC*, 216 F. Supp. 3d 1304, 1311 n.1 (W.D. Okla. 2016).

### C.    Retaliation

Defendant also asks the Court to grant summary judgment in its favor on any claim of retaliation under the ADA or OADA.  *See* Mot. [Doc. No. 31] at 26–28.  Though Defendant does not cite the ADA's retaliation provision, 42 U.S.C. § 12203(a), it analyzes the elements required to prove a claim under § 12203(a).  *Compare* Mot. [Doc. No. 31] at 26 (quoting *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018)) *with Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1186–87 (10th Cir. 2016) ("To establish a prima facie case of ADA retaliation, a plaintiff must prove that (1) he 'engaged in a protected activity"; (2) he was "subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity'; and (3) there was 'a causal connection between the protected activity and the adverse employment action.'" (quoting *Anderson*, 181 F.3d at 1178).

But Plaintiff's Complaint [Doc. No. 1] does not assert a claim under § 12203(a). *See Foster*, 830 F.3d at 1186 (distinguishing "between the elements of an ADA retaliation claim and an ADA discrimination claim").  Similarly, Plaintiff has not indicated in any other filing—his Response [Doc. No. 41], the Joint Status Report and Discovery Plan [Doc.

No. 12], his Proposed Jury Instructions [Doc. No. 48], or the parties' Joint Pretrial Report [Doc. No. 51]—that he intends to pursue a retaliation claim under § 12203(a).[17]

The Court declines to analyze a claim that Plaintiff did not previously bring, and which cannot now be asserted without amending the Complaint. *See Navajo Nation Hum. Rts. Comm'n v. San Juan Cnty.*, 281 F. Supp. 3d 1136, 1149 (D. Utah 2017) ("[T]he liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a) . . . does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam))). Thus, this portion of Defendant's Motion is DENIED AS MOOT.

## IV.   <u>Conclusion</u>

IT IS THEREFORE ORDERED that Defendant Clean Harbors Environmental Services, Inc.'s Motion for Summary Judgment [Doc. No. 31] is DENIED, as set forth herein.

IT IS SO ORDERED this 3rd day of February, 2023.

**SCOTT L. PALK**
**UNITED STATES DISTRICT JUDGE**

---

[17] To the contrary, Plaintiff asserts that the purported basis for a retaliation claim—Defendant terminating Plaintiff after he requested leave for medical treatment—"is actually deemed discrimination by the ADA." Pl.'s Resp. [Doc. No. 41] at 30 (citing *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1167 (10th Cir. 1999)). Because the Court has already determined summary judgment is not warranted as to Plaintiff's disability discrimination claim, *see supra*, it need not consider this argument.